OTIS T. HALL

*v.*

THE PEORIA AND EASTERN RAILWAY COMPANY.

*Filed at Springfield November 2, 1892.*

1. STATUTE OF FRAUDS—*performance of verbal contract to take case out of the statute.* A parol agreement for the purchase of land, when the purchase money is paid and possession is given and taken under the contract, and the purchaser makes lasting and valuable improvements thereon, will be specifically enforced, as such part performance is sufficient to take the case out of the Statute of Frauds.

2. Where the vendor of land for a railroad depot accepts the amount raised by subscription, when collected, in full satisfaction of the contract of purchase, the exact amount agreed to be paid will be a matter of no importance, especially when the vendor has the land surveyed and staked off, and removes his fences from the land, and gives possession.

3. SPECIFIC PERFORMANCE—*relief based on offer in bill, though not proven to be a part of the contract.* Although the vendor of a tract of land for a railroad depot is not shown to have been entitled to a railroad pass for himself and family, yet if the successor of the company with whom the contract was made, by his bill, offers such a pass, a decree for specific performance predicated on such offer, and making provision for its enforcement in the future, may be regarded as proper.

4. LACHES—*not attributable to party in possession of lands sold.* Laches can not be imputed to a person who is in possession of the property in dispute under a contract for a deed. Until such possession is sought to be disturbed, the vendee is not required to bring suit to enforce the making of a deed.

APPEAL from the Circuit Court of McLean county; the Hon. ALFRED SAMPLE, Judge, presiding.

Mr. THOMAS F. TIPTON, and Mr. W. B. CARLOCK, for the appellant:

A verbal contract within the Statute of Frauds can not be enforced directly or indirectly, and can be neither ground of demand nor defense. *McGinnis* v. *Fernandez*, 126 Ill. 230;

Brown on Frauds, secs. 122, 131, 133; *Wheeler* v. *Frankenthal*, 78 Ill. 124.

Such contract can not be made available even in a collateral or incidental manner. *Cunningham* v. *Roots*, 2 M. & W. 248.

A contract can not be partly in writing and partly in parol. *Farwell* v. *Lowther*, 18 Ill. 252; *Frazier* v. *Howe*, 106 id. 563; *Cloud* v. *Greasley*, 125 id. 313.

The entire contract must be in writing, to satisfy the statute. The statute requires the contract, or some memorandum thereof, to be in writing, signed by the party to be charged. *Albertson* v. *Ashton*, 102 Ill. 50; *Chappell* v. *McKnight*, 108 id. 570; *Lasher* v. *Gardner*, 124 id. 450.

The company and its successors have never paid anything, or done any act to take the case out of the statute, and consequently can not enforce any contract. *Crook* v. *Trumble*, 66 Ill. 428; *Redfield* v. *Redfield*, 92 id. 198; *Langston* v. *Bates*, 84 id. 524; *Pickerell* v. *Morss*, 97 id. 220; Fry on Specific Per. sec. 390; *Fleming* v. *Carter*, 70 Ill. 286; *Fitzsimmons* v. *Allen*, 39 id. 440; *Temple* v. *Johnson*, 71 id. 13; *Wood* v. *Thornley*, 58 id. 464; *North* v. *North*, 84 id. 442.

The Statute of Limitations or *laches* may be taken advantage of on demurrer or by answer to the bill. *Walker* v. *Ray*, 111 Ill. 316; *Rogers* v. *Simmons*, 55 id. 70; *Carpenter* v. *Carpenter*, 70 id. 463; *Whipple* v. *Whipple*, 109 id. 424; *Castner* v. *Walrod*, 93 id. 171; *William* v. *Rhodes*, 81 id. 571; *Dickinson* v. *Burgess*, 20 id. 276; *Covington* v. *Covington*, 74 id. 446; *Bissell* v. *Lloyd*, 100 id. 214; *McKeon* v. *Vick*, id. 376; *Howe* v. *Smith*, 119 id. 101; *McDonald* v. *Stone*, 109 id. 45; *Hoyt* v. *Institution*, 110 id. 390; *McHany* v. *Schenk*, 88 id. 357.

Mr. F. Y. Hamilton, and Mr. John T. Dye, for the appellee:

A court of equity will decree the specific performance of a contract within the Statute of Frauds, when there have been such acts of performance by the party asking relief that he would suffer an injury amounting to a fraud if the other party

should not perform his part of the contract. *Wallace* v. *Rappleye,* 103 Ill. 252; *Clark* v. *Clark,* 122 id. 393; *Wood* v. *Thornley,* 58 id. 464; *Pickerell* v. *Morss,* 97 id. 220; *Warren* v. *Warren,* 105 id. 568; *Kaufman* v. *Cook,* 114 id. 11; *Fitzsimmons* v. *Allen,* 39 id. 440; *Blunt* v. *Tomlin,* 27 id. 93; *Kurtz* v. *Hibner,* 55 id. 514; *Wheeler* v. *Reynolds,* 66 N. Y. 237; *Irwin* v. *Dyke,* 114 Ill. 302; *Miller* v. *Ball,* 64 N. Y. 292; *Potter* v. *Jacobs,* 111 Mass. 32.

The Statute of Frauds is not applicable, and appellant is estopped from denying the parol agreement after part performance and acquiescence. *Wheeler* v. *Frankenthal,* 78 Ill. 127; *Telegraph Co.* v. *Railroad Co.* 86 id. 246; *Langston* v. *Bates,* 84 id. 524; *Railroad Co.* v. *Ragsdale,* 54 Miss. 200; *Railroad Co.* v. *McLanahan,* 59 Pa. St. 23; *Thompson* v. *McElarney,* 82 id. 174; *Maxwell* v. *Bridge Co.* 41 Mich. 453; *Railroad Co.* v. *Battle,* 66 N. C. 540.

The waiver as well as the performance of a contract may be by parol. *Provolt* v. *Railroad Co.* 57 Mo. 256; *Baker* v. *Railroad Co.* id. 265; *Kanaga* v. *Railroad Co.* 76 id. 207; *Campbell* v. *Railroad Co.* 110 Ind. 490.

Similar agreements for depot grounds have been recognized and enforced. *Railroad Co.* v. *Graff,* 27 Iowa, 99; *Railroad Co.* v. *Rich,* 33 id. 113; *Railroad Co.* v. *Rose,* 24 Ohio, 219; *Watterson* v. *Railroad Co.* 74 Pa. St. 208; 1 Rohrer on Railroads, 481.

Appellees are not bound to issue the life pass. Lewis on Eminent Domain, sec. 297; *Pennsylvania Co.* v. *Railroad Co.* 108 Pa. St. 621.

Making a plat in which a part of the ground is marked "depot grounds," and laying out the addition leaving that portion for the use of the railroad, is a dedication of the ground to the railroad, under the statute. Starr & Curtis' Stat. chap. 109, sec. 3; *Morgan* v. *Railroad Co.* 96 U. S. 716; *Railroad Co.* v. *Joliet,* 79 Ill. 25.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill brought by the Ohio, Indiana and Western Railway Company, successor to the property rights and franchise of the Danville, Urbana, Bloomington and Pekin Railroad Company, against Otis T. Hall, to enforce the specific performance of a contract for the conveyance of certain lands described in the bill, and to enjoin the prosecution of certain ejectment suits brought by Hall to recover the land in controversy. The original bill was filed on the 24th day of January, 1890. Several amendments were made to the bill, and on the 3d day of November, 1890, by leave of the court, the Peoria and Eastern Railway Company filed an amended bill, in which it was alleged that it is the lawful successor to all the property rights and franchises of the Danville, Urbana, Bloomington and Pekin Railroad Company, and also of the Ohio, Indiana and Western Railway Company. The bill, as amended, prayed that the defendant, Hall, be required to convey a strip of land one hundred feet wide, the right of way across the west half of the north-east quarter of section 23, town 24, range 1, west, in McLean county, and also a certain described eight acre tract on said eighty acre tract, where the depot of the complainant is located.

The relief prayed for in the bill as to the right of way is predicated on a written contract executed by the defendant on the 10th day of June, 1868, in which he agreed, in case the line of road was located and built across his eighty acre tract of land, to deed the railroad company the right of way; but as to the eight acres, reliance is placed on a verbal agreement, possession for a period of eighteen or twenty years, and the making of lasting and valuable improvements. The defendant, in his answer, conceded his obligation to convey the right of way as provided in the written contract which he had executed, but denied all obligation to convey the eight acre tract, and set up as a defense the Statute of Frauds, the

Statute of Limitations, and charged *laches* on the part of the complainant.

If the defendant, Hall, agreed to convey the eight acres of land for a certain specified consideration, which he received, and the railroad company entered into the possession of the land under the agreement, and made, or caused to be made, lasting and valuable improvements, a court of equity will enforce the specific performance of the contract, although the agreement was by parol. *Langston* v. *Bates*, 84 Ill. 524; *Western Union Tel. Co.* v. *Chicago and Paducah Railroad Co.* 86 id. 252; *Irwin* v. *Dyke*, 114 id. 306.

The fact that a contract was made, under which the railroad company was to have the eight acres of land, is not disputed, but there is a dispute in regard to the terms of the contract. It appears that in the fall of 1869, when the railroad was being built, the question arose whether the depot should be located on the right of way obtained of Hall, at Danvers, or whether it should be located one mile further east, at Wilkesborough. The railroad wanted eight acres of land, in addition to the right of way, for depot purposes, and it seems all the land needed had been offered as a donation at Wilkesborough, but the people at Danvers did not wish to lose the depot, and we think, after a careful consideration of all the evidence, the fact was established that the people of Danvers agreed to raise some $300, to be paid to Hall in consideration for the eight acres of land in controversy; that the money was raised by subscription and accepted by Hall, and after receiving the money he surveyed and staked the eight acres of land, and removed his fences, and turned it over to the railroad company.

Ira Abbott, a resident of Danvers, testified, as shown by the abstract, in substance as follows: "Lived in Danvers thirty-five years; am a merchant; the first I knew about the controversy was when Mr. King came to me; the parties at Wilkesborough made a proposition; he told me how much

land they wanted, and that I had better see Hall; Hall and others told me he did not feel able to give as much land as they required, but was willing to give the right of way; my recollection is that he wanted the sum of about $300 to let the company have as much land as it required; the land, including right of way, was ten acres; the controversy about the location of the depot was in the year 1869; I wrote out a subscription paper and circulated it; was in my custody until a few years ago; where it is now I can't tell; I have made diligent search; Hall requested me to do so; I think I got all of the subscription myself; I can't tell to a dollar, but I think it was in the neighborhood of $300. * * * After the subscriptions were made Hall moved his fences; the subscription was nearer $300 than $200; we raised it, or near the amount, and he accepted it; I did not hear about a pass until years afterwards; he did not tell me he only received $125."

John Sloan testified: "Live in Indianapolis; am roadmaster of the Ohio, Indiana and Western railway, and have been connected with this railway ever since it was built; in December, 1869, a controversy came up between Danvers and Wilkesborough as to which should have the depot; the people of Danvers got up a subscription; how much it was I can't say; land was thrown out and the station built at Danvers; this was during the winter of 1869 and 1870; the land is about as the fence is located now on the south side; on the north side it was a triangular piece of land, and the plat is correct and shows the land described; the railroad has always controlled those pieces and given other persons doing business with the company location on the land; the buildings on the plat are three grain houses, corn-crib, coal-bins, two or three small houses, a tile factory and two scale-houses, and all used in connection with the railroad; do not know when the stock pens were built; the stock pens are on both pieces; no notice has been served upon me for the possession of these tracts." On cross-examination he testified: "I knew the land was

thrown out, and Hall took the engineer and staked it out, and the company had use of it for twenty years."

A number of witnesses testified to the amount they subscribed and paid, and that Hall moved his fences and turned the land over in the spring of 1870. Abbott being recalled, testified: "The citizens wanted the depot located on his (Hall's) land; were willing to pay their money so that he could give the land; * * * he took the money as fast as it was paid over; he did not refuse to take the subscription; that was all good."

The defendant, Hall, admitted that a contract was made and the eight acres of land turned out, but he insists that it contained a provision for a pass. He testified: "They said they would not put the depot at Danvers unless we gave them more land than the right of way; I finally verbally agreed to give a certain tract of land,—eight acres,—with the right of way I had given, and they were to give me for it a life pass on the road, and I was to make them a deed; the life pass was to be for me and my family; they never gave a pass to me; I told them I would make a deed when they gave me my pass, whether I got a nickel from the town or not; I moved the fence in January, 1870, and it has remained substantially the same ever since; I had the survey made that I might turn out eight acres of ground, and did turn it out, and have not occupied it since that time." He further testified: "I don't know but what I did want $500 for the land turned out; I said I would make a deed as soon as they complied in giving my pass, no matter whether I got any more from the town or not; they took up a subscription for my benefit."

In the view we take of the case the amount of money Hall was to receive for the eight acres of land he agreed to convey is not a material fact, as it is apparent that the money raised by the people of Danvers and paid over to Hall was accepted by him in full satisfaction of the amount agreed to be paid. Whether the amount was $300 or more is a matter of no

moment. The money raised and paid over was treated as a payment of the amount agreed upon between the people of Danvers, Hall and the railroad company, and from the time the money was paid over to Hall and the land turned out to the railroad company, no claim has ever been made by Hall, so far as is shown by the evidence, that anything remains due. As to the fact of payment we think the proof is ample. As to the possession of the property by the railroad company from 1870 until 1890, the time the bill was filed, that question is beyond dispute. It is true the railroad company did not fence the eight acres, but that was not required. That would have defeated the object for which the land was obtained. The land was obtained for depot purposes, and has been devoted to that purpose. A depot, elevator, cattle pens, corn-cribs, etc., have been erected on the land by the railroad company, and through its permission, and used ever since the land was acquired. The possession of the property is as complete in the railroad company as it would have been had the land been fenced. The various improvements placed on the land, with the exception, perhaps, of the depot and cattle pens, were not made by the railroad company, but they were by the permission of the company, for its benefit, for the purpose of enhancing its business. To recapitulate: Here is a parol agreement for the land, purchase money paid, possession under the agreement, with lasting and valuable improvements made on the property. This is sufficient to take the case out of the operation of the Statute of Frauds.

But one other matter remains to be considered, and that is, whether it was a part of the parol contract that Hall should have a pass over the road for himself and family. He testified that was a part of the contract, but in this he was not corroborated by any other witness. On the other hand, those familiar with the transaction testify that the pass did not enter into the contract. Abbott testified that he never heard of the pass until years after the arrangement was consummated. Hodge, a

director of the company, who lived in Danvers, testified that he frequently talked with Hall about the matter; "he was to receive about $300; Hall claimed he would like to have a life pass or a family pass; in one of our meetings the pass wasn't allowed; we handed over our money and he moved his fence back; I think it was in the spring it was moved; I don't recollect whether it was before or after the fence was moved that the money was raised; ground occupied ever since by the railroad company, with elevator, corn-cribs, etc., built on it."

Before the hearing the railroad passed into the hands of the Peoria and Eastern Railroad Company, and in the amended bill it offered a pass to Hall for himself and family, and in the decree the court made provision for the enforcement, in the future, of the offer contained in the bill. As said before, we do not think Hall, under the evidence, entitled to a pass over the road, but as the complainant offered to furnish a pass, the decree predicated on the offer may be regarded as proper.

It is insisted in the argument that complainant is barred of relief on the ground of *laches*. As to this question it is sufficient to say that *laches* can not be imputed to a party who is in the possession of the property in dispute under a contract for a deed, as the railroad company was in this case. There was no necessity for bringing a bill for relief until the appellant created the necessity by bringing an action to recover the possession of the property.

The decree of the circuit court will be affirmed.

*Decree affirmed.*

Mr. JUSTICE MAGRUDER: I do not concur in this decision for the reasons stated in the opinion filed on the former hearing.